UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMIKA L. GAINES,

        Plaintiff,

                                  Civil Case No. 18-11879
v.                               Honorable Linda V. Parker

FCA US LLC,

        Defendant.
_____/

## OPINION AND ORDER

This lawsuit arises from Plaintiff Tamika Gaines' former employment with

Defendant FCA US LLC. In a Complaint filed June 13, 2018, Plaintiff (hereafter

"Ms. Gaines") asserts the following claims against Defendant (hereafter "FCA"):

(I) race discrimination in violation of 42 U.S.C. § 1981 ("§ 1981"; (II) retaliation

in violation of § 1981; (III) race discrimination in violation of Michigan's Elliott-

Larsen Civil Rights Act ("ELCRA"); (IV) sex discrimination in violation of the

ELCRA; and (V) retaliation in violation of the ELCRA. (Compl., ECF No. 1.)

The matter is presently before the Court on FCA's motion for summary judgment

filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 25.)

The motion has been fully briefed. (ECF No. 29, 32.) Finding the facts and legal

arguments sufficiently presented in the parties' briefs, the Court is dispensing with

oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the

non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Relevant Conduct

As an initial matter, FCA argues that only conduct occurring within the relevant statute of limitations should be considered when deciding its summary judgment motion. (Def.'s Br. in Supp. of Mot. at 19-20, ECF No. 25 at Pg ID 113-14.) Under both Michigan law and federal law, claims regarding events that occurred before the relevant statutory period cannot form the basis of a lawsuit. *Leffman v. Sprint Corp.*, 481 F.3d 428, 431 (6th Cir. 2007) (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (" 'A discriminatory act which is not made the basis for a timely charge is … merely an unfortunate event in history which has no present legal consequences.' ")); *see also Garg v. Macomb Cty. Cmty. Health Serv.*, 696 N.W.2d 646, 659 (Mich. 2005) (ELCRA). Nevertheless, such conduct may be considered as "background evidence" to support a claim based on actionable conduct *within* the limitations period. *See United Air Lines*, 431 U.S. at 558 (Providing that a discriminatory act which is not made the basis for a timely charge still "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue); *Campbell v. Dep't of Human Serv.*, 780 N.W.2d 586, 590-92 (Mich. Ct. App. 2009). In other words, the

evidence is relevant as background to put Ms. Gaines' hostile work environment and retaliation claims in context.

## III.    Factual and Procedural Background

In September 2016, Ms. Gaines began working as a Professional Maintenance Specialist ("PMS") in the Maintenance Department of FCA's Sterling Heights Assembly Plant ("SHAP").  (Gaines Dep. at 19, ECF No. 29-3 at Pg ID 515.)  Patrick Soward, the acting plant manager, hired Ms. Gaines.  (*Id.* at 50-52, Pg ID 523.)  Maintenance Manager Ron McNeill was Ms. Gaines' immediate supervisor.  (*Id.* at 20, Pg ID 515.)  Mr. McNeill was on vacation when Mr. Soward hired Ms. Gaines.  (*Id.* at 51, Pg ID 523.)  Ms. Gaines is an African-American woman.  None of the Maintenance Supervisors and PMS's with whom she worked in the SHAP maintenance office were African-American or female. (*See id.* at 50, 63-64, Pg ID 523, 526; *see also* Shelton Dep. at 23, ECF No. 29-8 at Pg ID 739.)

Prior to Ms. Gaines' arrival, another African-American woman, Danita Shelton, worked in the Maintenance Department.  Ms. Shelton asked to be transferred to another department after an incident with Mr. McNeill, which Ms. Shelton felt was racially offensive.  (Shelton Dep. at 36, 95, ECF No. 29-8 at Pg ID 742, 757.)

Specifically, in January 2016,[1] while Ms. Shelton and her co-workers were discussing whether to distribute bottled water in Flint after the drinking water became contaminated with lead, Mr. McNeill stated: "Why would I do that? Those people should work hard to not live in places like that." (*Id*. at 24-27, Pg ID 739-40.) When Ms. Shelton asked Mr. McNeill what he meant, Mr. McNeill said the people needed to "get off their butts" and "work hard not to live in places like that … Just like Detroit." (*Id*. at 27-28, Pg ID 740.) Mr. McNeill also extended his hand out and said, "They always have their hands out." (*Id*. at 28, 34, Pg ID 740, 742.) Mr. McNeill then said that "they need to put a fence around Detroit . . . an 18 [sic] fence around Detroit, throw gasoline and … burn them." (*Id*. at 34-35, Pg ID 742.) According to Ms. Shelton, Mr. McNeill was yelling. (*Id*. at 35, Pg ID 742.)

Ms. Shelton was "very upset" and offended by Mr. McNeill's statements. (*Id*. at 36-37, Pg ID 742-43.) She viewed them as racist because the residents of Flint and Detroit are predominately African-American. (*Id*.) Ms. Shelton reported the incident to Jennifer Campau in SHAP's human resources office. (*Id*. at 41-42, Pg ID 744.)

---

[1] Ms. Shelton initially testified that the incident occurred in January 2017. Later in her deposition, Ms. Shelton realized she was a year off in describing the incident and that it occurred in January 2016. (Shelton Dep. at 78-79, ECF No. 29-8 at Pg ID 753.)

5

Ms. Shelton subsequently was informed that FCA had investigated the matter and concluded, a that while in bad taste, Mr. McNeill's comments could not be deemed to have reflected racism as opposed to classism.  (*Id*. at 44, 47, Pg ID 744, 745.)  Ms. Shelton was bothered because Ms. Campau had never asked her to write down a statement about what Mr. McNeill said (*id*. at 44, Pg ID 744) and she did not view his comments as being about classism as "[t]here's a lot of poor people between Flint and Detroit.  Why pick Detroit if we're discussing Flint?" (*Id*. at 50, Pg ID 746.)  When Ms. Shelton was shown Ms. Campau's notes of what Ms. Shelton reported, Ms. Shelton found a lot of her statements missing.  (*Id*. at 82-83, Pg ID 754.)  At his deposition in this matter, Mr. McNeill testified that he was neither counseled about nor disciplined for the incident.  (McNeill Dep. at 32, ECF No. 29-7 at Pg ID 692.)

When Mr. McNeill returned to work after Ms. Gaines joined the Maintenance Department, he walked through the office greeting Ms. Gaines' co-workers.  (Gaines Dep. at 50-51, ECF No. 29-3 at Pg ID 523.)  When he reached Ms. Gaines, Mr. McNeill said: "Where the hell did you come from?"  (*Id*.)  After Mr. McNeill left the room, Ms. Gaines asked her co-workers what he meant.  (*Id*. at 53, Pg ID 523.)  Bob Lentz, a Maintenance Supervisor, responded: "We've already gotten rid of one of you."  (*Id*. at 53-54, Pg ID 523-24.)  Another Maintenance Supervisor, Dan Kowalski, then clarified that Mr. Lentz was referring

to Ms. Shelton.  (*Id*. at 54, Pg ID 524.)  When Ms. Gaines shared Mr. McNeill's comments with an FCA supervisor, Tom Schef, Mr. Schef advised Ms. Gaines that Mr. McNeill did not feel Black women belonged in maintenance.  (*Id.* at 198, Pg ID 560; Gaines Aff. ¶ 5, ECF No. 29-4 at Pg ID 616.)

On another occasion within months of Ms. Gaines' arrival at SHAP, Mr. Lentz referred to Mr. Soward, the interim plant manager who interviewed and hired Ms. Gaines, as the "House N[word]" and stated that Mr. Soward only became interim plant manager through affirmative action.  (Gaines Dep. at  214-215, ECF No. 29-3 at Pg ID 564.)  Mr. Lentz also told Ms. Gaines that she wouldn't make it at Toyota (where he was previously employed) because Toyota is "not as diverse" as FCA.  (*Id*. at 185, Pg ID 556.)

In February 2017, during Black History month, Mr. Lentz stated, in Plaintiff's presence, "Oh its February, I guess that means we're going to be eating collard greens."  (*Id*. at 158 Pg ID 550.)  The following month, as Ms. Gaines approached several Maintenance Supervisors (Mr. Lentz, Dan Kowalski, and Carl Brasile), she heard one of them comment: "Here comes Harriet Tubman."  (*Id*. at 158, 165-68 Pg ID 550, 552.)

Ms. Gaines testified that Mr. McNeill verbally abused her, although she acknowledged that this was his management style (which she described as "[m]ore like a dictatorship") and that she was not the only employee in the department to

whom he directed his swearing and yelling. (*Id.* at 39-42, Pg ID 520-21; *see also* Def.'s Mot. Ex. M, ECF No. 25-14.) In September or October 2016, Mr. McNeill berated Ms. Gaines for assisting the World Class Manufacturing ("WCM") Lead with a PowerPoint presentation (after specifically asking Ms. Gaines to help the Lead), calling her a "f---ing idiot" and other expletives. (Gaines Dep. at 76-82, ECF No. 29-3 at Pg ID 529-31.) Maintenance Supervisor Jay Johnson told Ms. Gaines that Mr. McNeill then said, "that bitch is getting on my nerves." (*Id*. at 46-47, Pg ID 522.)

Ms. Gaines felt that Mr. McNeill scrutinized and harassed her differently than her male, white colleagues. He frequently quizzed her about her whereabouts. (*Id*. at 194, Pg ID 559.) Mr. McNeill claimed that it is his management style to require his reports to check-in with him. (Def.'s Mot. Ex M, ECF No. 25-11 at Pg ID 3.) Shaun Oldfield, one of Ms. Gaines' co-workers, testified that McNeill asks questions regarding his employees' whereabouts. (*Id.*) But Mr. McNeill also ordered an analysis of Ms. Gaines' "gate rings" to assess her comings and goings at the plant. (McNeill Dep. at 67-69, ECF No. 29-7 at Pg ID 701; Campau Dep. at 51-52, ECF No. 29-9 at Pg ID 791.)

Ms. Gaines felt Mr. McNeill did not want to work with her, as he would refer her to someone else when she asked questions. (Gaines Dep. at 171, ECF No. 29-3 at Pg ID 553.) He ignored her ideas and opinions, accepting the same

solution she proposed only after it was presented by a man.  (*Id.* at 69-71, 74-76,

Pg ID 527-28; McNeill Dep. at 56-57, ECF No. 29-7 Pg ID 698.)  While Ms.

Gaines repeatedly asked Mr. McNeill for overtime work on the weekend

supervising the skilled trades (which meant increased pay and the opportunity to

work as a supervisor), she was never afforded the opportunity while all of her

white, male colleagues were.[2]  (*Id.* at 156-57, 160-62, 164, 167-169, Pg ID 549-

52.)  Ms. Gaines also was not allowed to participate in interviews for millwrights,

despite her skilled trades/millwright background and completion of an interviewing

class when she first started at FCA.[3]  (*Id.* at 156-57, Pg ID 549.)  Her co-workers,

who were not skilled trades, were able to participate in interviews, however.  (*Id.*)

On May 15, 2017, Ms. Gaines sent an email to Jennifer Campau in HR,

complaining about race and gender discrimination.  (Def.'s Mot. Ex M, ECF No.

25-14.)  In the email and when she was subsequently interviewed, Ms. Gaines

---

[2] Mr. McNeill testified at his deposition in this matter that everyone in the Maintenance Department had the opportunity to work weekends, and that Plaintiff did so on a few occasions.  (McNeill Dep. at 48-49, ECF No. 29-7 at Pg ID 696.) The Court, however, must accept Ms. Gaines' evidence as true and draw "all justifiable inferences in [her] favor."  *Liberty Lobby*, 477 U.S. at 255.
[3] FCA claims that Ms. Gaines was asked to conduct interviews on multiple occasions, presenting as evidence an email sent to numerous FCA employees, including Ms. Gaines, requesting volunteers to participate in interviews.  (Def.'s Reply Br. at 1, ECF No. 32 at Pg ID 915, citing Ex. AA, ECF No. 32-2.)  The email does not show, however, that Ms. Gaines was allowed to participate. Moreover, the initial email refers to interviews of *nonskilled* workers.  (*Id.*)  In any event, the Court must accept Ms. Gaines' evidence as true when presented with conflicting evidence.

stated that she was in a "Good Old Boys" network, felt mistreated because she was female and/or a Black female, and relayed examples of her treatment. (*Id*.; *see also* Def.'s Mot. Ex. J, ECF No. 25-11 at Pg ID 262-66.) After interviewing Mr. McNeill and two of Ms. Gaines' co-workers, Shaun Oldfield and Morris Baker, HR found nothing to support Ms. Gaines' claim that Mr. McNeill treated her differently than her male, white colleagues. (Def.'s Mot. Ex. J at 3, ECF No. 25-11 at Pg ID 263.) Ms. Gaines was informed that her complaint had been investigated and appropriate action had been taken based on FCA's policies and the circumstances. (*Id.* Ex. N, ECF No. 25-15.) In this memo, signed by Ms. Gaines and Ms. Campau, Ms. Gaines was advised to report any future concerns to FCA's Ethics Helpline. (*Id.*)

Ms. Gaines experienced increased harassment and isolation after she filed her HR complaint. (Gaines Dep. at 219-223, ECF No. 29-3 at Pg ID 565-66.) For example, her male colleagues ignored her, stared at her and refused to answer when she asked questions, threw paperwork on her desk instead of handing it to her, and failed to hold the door open for her when she was walking through directly behind them. (*Id.*) She was *regularly* excluded from team breakfast and lunch gatherings.[4] (*Id.* at 126-31, Pg ID 542-43.) On one occasion when Ms.

---

[4] FCA presents evidence indicating that Ms. Gaines' exclusion *on one occasion* was due to an unintentional oversight. (*See* Def.'s Br. in Supp. of Mot. at 7-8, ECF No. 25 at Pg ID 101-02, citing Ex. L at 4, ECF No. 25-13 at Pg ID 314; Ex. G,

Gaines heard her co-workers preparing to order lunch and she asked to be included, no one told her the food was in a conference room until after they had finished eating and were leaving the room. (Gaines Dep. at 129-30, ECF No. 29-3 at Pg ID 542-43.)

Ms. Gaines' co-workers refused to give her rides on the golf carts used to traverse the expansive plant, even when passing her going in the same direction and she tried to flag them down. (*Id*. at 159, 174-75, 188, Pg ID 550, 554, 557.) Ms. Gaines' colleagues were provided copies of keys to use the carts, but she was not. (*Id*. at 189, Pg ID 557.) Ms. Gaines' radio was given to Mr. Oldfield and when new radios were ordered, one was not ordered for her. (*Id*. at 135, 190, Pg ID 544, 558.)

In September 2017, Maintenance Supervisor Jay Johnson tried to save files to the Maintenance Department's share drive and discovered there was no available space because the drive contained a non-FCA file belonging to Ms. Gaines. (McNeill Dep. at 85-86, 89, ECF No. 29-7 at Pg ID 705-06.) Mr. Johnson reported this to Mr. McNeill and, together they went to HR with a laptop and showed Ms. Campau the file. (*Id*. at 87, Pg ID 706; *see also* Campau Dep. at 69,

_____

ECF No. 25-8 at Pg ID 248.) Ms. Gaines claims that her exclusion was a frequent occurrence, however.

11

ECF No. 29-9 at Pg ID 796.)  Ms. Campus emailed FCA's Senior EEO Staff

Advisor, Valencia DeLoach, reporting:

> Tamika Gaine's [sic] supervisor brought to my attention the other day
> that she has been working on personal stuff during work hours.  They
> found a file that was saved on the assembly maintenance shared drive
> with bylaws for a nonprofit that she works with …When you get a
> minute, can you give me a call on this?
>
> Due to the investigation we had [i.e., regarding Ms. Gaines'
> discrimination complaint] I wanted to consult with you first.

(Campau Dep. at 68, ECF No. 29-9 at Pg ID 795.)  During her deposition in this

matter, Ms. Campau testified that she did not want to consult with Ms. DeLoach

because she thought Mr. McNeill's report was potentially retaliatory (*id*. at 70, Pg

ID 796); instead, Ms. Campau "wanted to review it with her, to just understand,

because there was an ongoing investigation—."  (*Id*. at 68, Pg ID 795.)

Ms. Campau then requested assistance from FCA's Corporate Security

Services to review Ms. Gaines' laptop, email, and personal drive "to substantiate

an allegation that she is using company time and resources for her personal non-

profit fundraising activities."  (Def.'s Mot. Ex. P at 2, ECF No. 25-17 at Pg ID

375.)  Corporate Security Investigator Steffan Gaydos subsequently reviewed Ms.

Gaines' "FCA assets" (i.e., her email and laptop).  (*Id*. at 3, Pg ID 376.)  Mr.

Gaydos discovered several emails between December 2016 and October 2017,

related to Ms. Gaines' nonprofit, Hope for America ("HFA").  (*Id*.)  He also

discovered 57 files on the desktop of Ms. Gaines' laptop, 14 files in the laptop's

downloads folder, and 18 files in a personal network folder. (*Id*.) Duplicate files also were found on the Maintenance Department's shared drive. (*Id*. at 2, Pg ID 375; *see also* Gaydos Dep. at 50-51, ECF No. 29-5 at Pg ID 634.) Mr. Gaydos did not believe the shared folder was full. (Gaydos Dep. at 52, ECF No. 29-5 at Pg ID 634.)

Mr. Gaydos determined that Ms. Gaines was at work during some of the time she used her FCA email and laptop for HFA business. (*Id*. at 90, Pg ID 644.) However, his focus was not on how often the use occurred while she was at work or off work. (*Id*. at 91, Pg ID 644.)

On January 5, 2018, Mr. Gaydos and FCA Digital Forensics Investigator and Corporate Security employee William Liczbinski interviewed Ms. Gaines. (Def.'s Mot. Ex. P at 3, ECF No. 25-17 at Pg ID 376.) They found Ms. Gaines to be pleasant, professional, and forthcoming about her use of her FCA laptop for HFA business. (Gaydos Dep. at 36, ECF No. 29-5 at Pg ID 630; Liczbinski Dep. at 20-21, ECF No. 29-6 at Pg ID 667-68.)

Ms. Gaines explained that she started HFA to recruit people into skilled trades positions at FCA, which she viewed as a benefit to FCA. (Gaines Dep. at 91-93, 116-18, 232, ECF No. 29-3 at Pg ID 533, 539-40, 568; *see also* Def.'s Mot. Ex. P at 3, ECF No. 25-17 at Pg ID 376.) Ms. Gaines applied to have HFA registered with FCA's Motor City Citizens on April 11, 2017. (Def.'s Mot. Ex. P

at 3, ECF No. 25-17 at Pg ID 376.)  Motor City Citizens identifies volunteer programs where FCA employees can donate their time.  (*See* Gaydos Dep. at 37, ECF No. 29-5 at Pg ID 631.)  FCA and non-FCA individuals can apply for volunteer opportunities to be listed with Motor City Citizens.  (*Id*. at 38-39, Pg ID 631.)

Ms. Gaines believed that she did not have to ask permission to conduct HFA business on her laptop and during work hours because Motor City Citizens had approved the non-profit and its work was related to helping FCA.  (Def.'s Ex. P at 1, ECF No. 25-17 at Pg ID 376; Gaines Dep. at 99-100, 112, 116, 118-20, 232-33, ECF No. 29-3 at Pg ID 535, 538-40, 568.)  She thought her use was authorized. (*Id.*)  Ms. Gaines testified that Mr. Gaydos said his office's involvement in her case was unusual, as they typically were asked to investigate employees suspected of accessing pornography, online gambling, or engaging in improper or excessive misuse of company equipment, not when an employee was doing something "good" for FCA.  (Gaines Dep. at 92-93, 108-110, ECF No. 29-3 at Pg ID 533, 537-38.)  According to Ms. Gaines, Mr. Gaydos advised her that there was no problem using her laptop for HFA work, even during the work day, provided the time spent was not excessive amount.  (*Id*. at 92-93, 118-19, 152-53, Pg ID 533, 540, 548.)

14

After interviewing Ms. Gaines, Mr. Gaydos looked further into HFA's status with Motor City Citizens and then prepared his investigative report. (Def.'s Mot. Ex. X, ECF No. 25-25 at Pg ID 440.) On January 28, 2018, Mr. Gaydos presented his report to the "In Re," a group of individuals tasked with reviewing the case. (*Id.*) At the meeting, the decision was made to terminate Ms. Gaines' employment. (*Id.*)

In the interim, on January 12, 2018, Ms. Gaines learned that she had been excluded from another Maintenance Department breakfast meeting. (*Id.* at 131-32, Pg ID 543.) As Ms. Gaines approached the location of the meeting, she overheard Mr. Lentz say, "that ape better not run for President" referring to Oprah Winfrey. (*Id.*) Upon seeing Ms. Gaines, the group scattered. (*Id.*)

On the same date, a female FCA employee, Myrlene Gelibert-Bush, sent an email to a number of other female FCA employees, including Ms. Gaines, regarding Ms. Gelibert-Bush's efforts to create a "network of women that can come together to learn from each other and support each other." (Def.'s Mot. Ex. Q, ECF No. 25-18.) Ms. Gaines responded to Ms. Gelibert-Bush's email— inadvertently hitting "reply all"—writing:

> I really need to talk to somebody because I am so frustrated in how I am being treated I have went to HR and there seems to be no problem with how I am left out of ALL "teambuilding" or "TEAM" related interactions. In my male dominant environment it seems ok to alienate the double minority. I NEED SUPPORT!

(*Id.*, capitalization in original; *see also* Gaines Dep. at 90, 136-37, ECF No. 29-3 at Pg ID 533, 543-44.) HR employees Ms. Campau and Lori Otis received Ms. Gaines' email.

Ms. Otis criticized Ms. Gaines for sending the email because it now involved everyone who received it. (Gaines Dep. at 90-91, ECF No. 29-3 at Pg ID 533.) Ms. Campau informed FCA's Senior EEO Staff Advisor, Valencia DeLoach, of Ms. Gaines' concerns. (*See* Def.'s Mot. Ex. L, ECF No. 25-13.) Ms. DeLoach thereafter interviewed Ms. Gaines and her office investigated her complaints. (*Id.*) Ms. Gaines informed Ms. DeLoach that she is being subjected to a hostile work environment by way of being isolated due to her race and sex. (*Id.*) Ms. Gaines indicated that her exclusion at the January 26, 2018 Maintenance Department breakfast meeting prompted her email that day. (*Id.*)

After Ms. Gaines spoke with Ms. DeLoach, her co-workers' hostility and ostracism intensified. They did not speak to her and labeled her "confrontational." (Gaines Dep. at 222-23, ECF No. 29-3 at Pg ID 566.) On February 22, 2018, Mr. Kowalski yelled "f--- you" at Ms. Gaines and then called her a "black bitch." (*Id.* at 205-08, Pg ID 561-62.) Ms. Gaines "did what [she] always d[id] and retreated to the restroom and cried." (*Id.* at 208, Pg ID 562.) She reported the incident to Mr. McNeill who said he had it under control. (*Id.*) She also reported the incident to the EEO office, although the report Ms. DeLoach prepared concerning Ms.

Gaines' complaints fails to mention the "black bitch" comment. (Def.'s Mot. Ex. M at 3, Pg ID 25-13 at Pg ID 313.) At his deposition in this matter, Mr. Kowalski admitted that he screamed "f--- you" at Ms. Gaines, but he was "not aware" of and did not recall whether he also called her a "black bitch." (Kowalski Dep. at 50, 57, ECF No. 29-10 at Pg ID 851, 853.)

During FCA's investigation into Ms. Gaines' January 2018 complaint, some of her co-workers reported that she had "trouble getting along with people" and they found her "frustrating to work with[.]" (Def.'s Mot. Ex. D at 1, ECF No. 25-5 at Pg ID 240.) Co-worker Eric Heim described Ms. Gaines as "distant" and that she "seems [to] have an attitude." (*Id.* Ex. F, ECF No. 25-7 at Pg ID 246.) Co-worker Carl Brasile provided that he had few interactions with Ms. Gaines, but those "were abrasive": "When she wanted something, she demanded it. When you asked her to do something, it was always, 'you're not my boss.' It was never a pleasant exchange with her." (*Id.* Ex. G, ECF No. 25-8.)

FCA maintains that Ms. Gaines isolated herself by choosing a workspace separate from Maintenance Department colleagues after the space they shared was demolished and before new space was completed. (Def.'s Br. in Supp. of Mot. at 2-3, ECF No. 25 at Pg ID 96-97.) However, Ms. Gaines testified that after the department's new office was completed, Mr. McNeill told her that there was not

going to be space for her there. (Gaines Dep. at 33-34, ECF No. 29-3 at Pg ID 518.)

On March 14, 2018, Ms. Campau had Mr. McNeill bring Ms. Gaines to a conference room, where Ms. Compau informed Ms. Gaines that she was being fired for violating FCA policies related to her computer use. (*Id*. at 154, Pg ID 549; Def.'s Mot. Ex. W, ECF No. 25-24.) According to the termination letter Ms. Campau handed Ms. Gaines, Ms. Gaines was fired for violating three corporate policies: (1) Standards of Conduct #33 for unauthorized or inappropriate use of FCA equipment; (2) SSC 300 allowing for "occasional[]" use of FCA information systems provided the use "is consistent with" FCA policies, guidelines, and other behavior guidance; and (3) Corporate Policy 1-10 permitting employee-initiated charitable activities only if they meet specific requirements. (Def.'s Mot. Ex. W, ECF No. 25-24.)

As indicated, Ms. Gaines filed this lawsuit on June 13, 2018, asserting the claims listed at the beginning of this decision. In her response to FCA's summary judgment motion, Ms. Gaines clarifies what she is alleging. Specifically, Ms. Gaines claims:

> Count I- disparate treatment discrimination and harassment/hostile work environment based on race in violation of 42 U.S.C. § 1981;

> Count II- retaliatory harassment and termination for complaining about race discrimination in violation of § 1981;

18

Count III- disparate treatment discrimination and harassment/hostile work environment based on race in violation of the ELCRA;

Count IV- disparate treatment and harassment/hostile work environment based on gender under the ELCRA; and,

Count V- retaliatory harassment and termination for complaining about race and gender discrimination under the ELCRA.

(Pl.'s Resp. Br. at 22, ECF No. 29 at Pg ID 488.) According to Ms. Gaines, the adverse actions asserted in her disparate treatment claims are: (1) denial of overtime (and pay) and (2) race-based harassment/hostile work environment. (*Id.*)

## IV. Applicable Law and Analysis

### A. Framework Applicable to All Claims

Discrimination and retaliation claims brought under § 1981 and the ELCRA are analyzed similarly to claims brought under Title VII of the Civil Rights Act of 1964. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 764, 771 (6th Cir. 2018) (citations omitted); *In re Rodriguez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007) (explaining that the ELCRA resembles federal law, and the same evidentiary burdens prevail as in Title VII cases). To establish discrimination or retaliation based on race or gender, the plaintiff "must present direct evidence of discrimination [or retaliation] or introduce circumstantial evidence that would allow an inference of discriminatory [or retaliatory] intent." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination [or

retaliation] was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). As Ms. Gaines and FCA proceed as if direct evidence of discrimination is lacking in this case, the Court will do the same.

In that instance, the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Rogers*, 897 F.3d 771. The plaintiff first must establish a prima facie case of discrimination or retaliation. *Id.* at 772 (citation omitted). The defendant then has the burden of proffering a legitimate, nondiscriminatory or nonretaliatory reason for its decision. *Id.* (citation omitted). If the defendant does so, the plaintiff then must prove that the reasons offered by the defendant were a pretext for discrimination or retaliation. *Id.* (citation omitted).

## A. Disparate Treatment Discrimination under § 1981 and the ELCRA[5]

To set forth a prima facie case of disparate treatment discrimination, the plaintiff must establish the following: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for h[er] job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or

---

[5] As reflected in Ms. Gaines' claims, § 1981 prohibits conduct based only on race, which includes color, ancestry, and ethnicity. *See* 42 U.S.C. § 1981; *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987).

treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008) (citations omitted). If the plaintiff establishes such a prima facie case, an inference or rebuttable presumption of discrimination arises.

In its summary judgment motion, FCA does not address Ms. Gaines' claim that she was denied overtime because of her race and/or sex. In reply, however, FCA argues that "the evidence shows Plaintiff was given the same opportunity to work overtime on weekends and to supervise and interview skilled trades." (Def.'s Reply Br. at 1, ECF No. 32 at Pg ID 914.) FCA cites to Mr. McNeill's testimony to support its assertion that "[e]veryone in the Maintenance Department had the opportunity to work weekends, and Plaintiff did so." (*Id.*) FCA further states that Ms. Gaines, like all PMS's, had a skilled tradesperson to supervise and she was asked to conduct interviews on multiple occasions.

The Court finds a genuine issue of material fact with respect to this issue. First, Ms. Gaines' testimony contradicts the evidence on which FCA relies. Second, the fact that Ms. Gaines may have had the opportunity to work overtime on weekends does not mean that she was selected to do so. (*See* McNeill Dep. at 48, ECF No. 25-16 at Pg ID 337 (explaining that employees had to be scheduled for overtime work).) Third, her complaint is that she was not allowed to interview *skilled* tradespeople. FCA's evidence reflects only that she was offered a chance

on a single occasion to interview *nonskilled* workers. (*See* Def.'s Reply Ex. AA at 6, ECF No. 32-2 at Pg ID 931.)

FCA focuses solely on Ms. Gaines' prima facie case and does not offer a nondiscriminatory reason for why Ms. Gaines was denied overtime work on the weekends supervising skilled workers. Ms. Gaines offers sufficient evidence from which a reasonable juror could conclude that Mr. McNeill was hostile to African-American women and therefore did not offer Ms. Gaines this opportunity on account of her race and/or gender.

In short, the Court concludes that FCA is not entitled to summary judgment with respect to Ms. Gaines' disparate treatment claims (Counts I, III, and IV), to the extent those claims are based on the failure to assign her overtime work.

### B.     Harassment/Hostile Work Environment under § 1981 and the ELCRA

Again, Ms. Gaines is asserting hostile work environment claims based on race under § 1981 and race *and* gender under the ELCRA. Claims based on sex or gender are not actionable under § 1981. *See supra* n.5.

To succeed on a hostile work environment claim based on gender or race, a plaintiff

must show:

> (1) she belonged to a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on race [or gender], (4) the harassment was sufficiently severe or pervasive to

22

alter the conditions of employment and create an abusive working
environment, and (5) the defendant knew or should have known about
the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v.*

*KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999)).

Under the ELCRA, a plaintiff alleging a hostile work environment claim based on

gender must demonstrate the above elements in addition to showing that the

conduct or communication was sexual in nature (not simply based on anti-female

animus). *Haynie v. Michigan*, 664 N.W.2d 129, 133 (Mich. 2003)

FCA focuses on Ms. Gaines' ability to satisfy the third and fourth elements

of her prima facie case. FCA additionally argues that none of the alleged incidents

were sexual in nature, as required to support a claim under the ELCRA, and that

Ms. Gaines fails to demonstrate that it negligently failed to control her working

conditions.

As an initial matter, FCA is correct that Ms. Gaines cannot support her

gender-based ELCRA hostile work environment claim on conduct that is not

sexual in nature. The ELCRA defines "sexual harassment" as "unwelcome sexual

advances, requests for sexual favors, and other verbal or physical conduct or

communication of a *sexual* nature . . . ." Mich. Comp. Laws § 37.2103(i)

(emphasis added). "Discriminatory conduct that is gender-based but not sexual in

nature does not constitute sexual harassment." *Kalich v. AT&T Mobility, LLC*, 679

F.3d 464, 471-72 (6th Cir. 2012) (citing *Haynie*, 664 N.W.2d at 135). The conduct alleged by Ms. Gaines is gender-based, not sexual in nature. FCA, therefore, is entitled to summary judgment on Ms. Gaines' ELCRA hostile work environment claim, to the extent it is based on gender.

All of the circumstances must be considered when evaluating whether Ms. Gaines' work environment was "hostile" or "abusive." *Williams*, 643 F.3d at 511 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Factors include, but are not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The question is not whether the plaintiff perceived the environment to be abusive, but whether "a reasonable person would find [it] hostile or abusive."[6] *Id*. at 21. The court "must consider harassment "by all perpetrators combined," rather than "divid[ing] and categoriz[ing] the reported incidents." *Id.* (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999)) (footnote omitted). "However, … only harassment based on the plaintiff's race may be considered." *Id.* (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir.2000)).

_____

[6] However, if the plaintiff did not subjectively perceive the environment to be abusive, it cannot be said that the conduct actually altered the conditions of his or her employment and there can be no violation. *Harris*, 510 U.S. at 21-22.

24

Whether harassment was based on race can be established through "(1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)). "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Id.* (citing *Clay v. United Parcel Servs., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)).

"A hostile-work-environment claim is a single 'unlawful employment practice' that includes every act composing that claim, whether those acts are independently actionable or not[]." *Green v. Brennan*, 136 S. Ct. 1769, 1778 (2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-121 (2002)). A hostile work environment develops "over a series of days or perhaps years … Such claims are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. Some of the conduct Ms. Gaines describes was blatantly racist. The Court finds a genuine issue of fact with respect to whether Ms. Gaines' treatment in comparison to her Caucasian colleagues was due to her race. As the Sixth Circuit described in *Waldo v. Consumers Energy Company*, 726 F.3d 802 (6th Cir. 2013)—albeit in the context of gender-based harassment:

... ignoring and ostracizing a coworker—if motivated by gender-based animus, can be a form of gender-based harassment that contributes to a hostile work environment. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) (explaining that sex harassment "may include ridicule, ostracism, and other forms of hostility motivated by anti-female animus"); *O'Rourke v. City of Providence*, 235 F.3d 713, 729-30 (1st Cir. 2001) (holding that "exclusion," "denial of support," and coworkers' "silent treatment" can be considered as part of a hostile-work-environment claim); *Williams v. General Motors Corp.*, 187 F.3d 553, 565-66 (6th Cir. 1999) (holding that ostracization motivated by gender-based animus can contribute to a hostile work environment).

*Waldo*, 726 F.3d at 818. Viewed in totality, the Court believes a jury could find that Ms. Gaines was subjected to a work environment that was hostile or abusive.

FCA makes the additional argument that because Mr. Kowalski and Mr. Lentz were Ms. Gaines' co-workers, not her supervisors, it is not liable unless " 'it was negligent in controlling working conditions.' " (Def.'s Br. in Supp. of Mot. at 21, ECF No. 25 at Pg ID 115, quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).) FCA contends that Ms. Gaines produces no evidence to make this showing. "To the contrary," FCA argues, "all evidence shows that FCA US promptly investigated, and counseled Kowalski and Lentz regarding appropriate behavior." (*Id.*)

Ms. Gaines' hostile work environment claim is not premised only on Mr. Kowalski's and Mr. Lentz's comments, however. Their comments are not the only actionable conduct alleged. Ms. Gaines complained to human resources about additional behavior. (*See* Def.'s Mot. Ex. L; ECF No. 25-13.) Moreover, there is

evidence that some of the harassment came from Ms. Gaines' supervisor, Mr. McNeill. *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.")). The evidence also suggests that Mr. McNeill was aware of the conduct by employees within his department that Ms. Gaines describes in support of her claim. *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 735 (6th. Cir. 2006) (finding summary judgment improperly granted where the plaintiff's testimony indicated supervisors were aware of the harassment but largely ignored it)); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009) (deeming employer to have notice of harassment where the plaintiff's supervisor was present during and witnessed much of the conduct by the plaintiff's co-workers and participated in some of it).

A reasonable juror could find that FCA did not take proper actions to control Ms. Gaines' working conditions. FCA demonstrates that it has policies in place prohibiting and outlining procedures to report discrimination and retaliation in the workplace. (*See, e.g.*, Def.'s Reply Ex. BB, ECF No. 32-3 at Pg ID 933-35.) Nevertheless, a reasonable jury could find from FCA's failure to discipline any

individual in response to Ms. Shelton's and Ms. Gaines' complaints that it was negligent in controlling the work environment.

For these reasons, the Court is denying summary judgment to FCA on Ms. Gaines' hostile work environment claims based on race (Counts I and III). The Court is granting summary judgment to FCA on Ms. Gaines ELCRA hostile work environment claim based on gender (Count IV), however.

## C.    Retaliation

Ms. Gaines claims that she was subjected to harassment and terminated in retaliation for her complaints concerning race and gender discrimination.

Section 1981 and the ELCRA prohibit retaliation based on an individual's opposition to discriminatory conduct. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (holding that § 1981 encompasses claims of retaliation); Mich Comp. Laws § 37.2701(a). To establish a prima facie case of retaliation, a plaintiff must demonstrate:

> (1) that the plaintiff engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007). In the context of a Title VII claim, but-for causation is required to satisfy the fourth element. *Seane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427-28 (6th Cir. 2014) (citing *Univ. of Tex.*

*SW Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013)).  In a decision issued while FCA's motion was pending, the Supreme Court held that but-for causation applies to § 1981 claims, as well.  *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, No. 18-1171, -- U.S. -- (Mar. 23, 2020).  Under the ELCRA, the protected activity must be a "significant factor" in the adverse employment action. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 n. 2 (6th Cir. 2008) (citing *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (2001)).  Retaliatory harassment by a supervisor or a supervisor's failure to act to stop retaliatory harassment by co-workers can constitute an adverse employment action for purposes of a retaliation claim.  *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000); *Meyer v. City of Ctr. Line*, 619 N.W.2d 182, 188-89 (Mich. Ct. App. 2000).

    According to FCA, there is no evidence that Ms. Gaines was treated differently after she complained about discrimination.  FCA maintains that Mr. McNeill continued to act as he had before and does with everyone.  To the extent Ms. Gaines' co-workers treated her differently, FCA contends it was due to Ms. Gaines' own behavior, pointing out that Ms. Gaines' co-workers felt she was difficult to work with, isolated herself, and rejected their help and requests for information.  The Court believes that it is for a jury to decide whether FCA's take on the evidence is accurate, as Ms. Gaines presents evidence supporting a different

29

explanation for the alleged mistreatment.  For example, Ms. Gaines' evidence reflects that some of her co-workers began ignoring and ostracizing her *only after* she complained about race and gender discrimination and that the harassment from other co-workers intensified after she complained.

FCA also argues that it is entitled to summary judgment with respect to Ms. Gaines' retaliation claim because there is no evidence that any of the individuals who participated with the In Re were aware of Ms. Gaines' protected activity.  The evidence reflects, however, that Mr. McNeill—who undoubtedly knew about Ms. Gaines' discrimination complaints—reported the conduct which led to her termination.[7]

"[I]f a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable …."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis in original).  The Supreme Court applied this so-called "cat's paw liability" where the

---

[7] Ms. Gaines also points out that, when answering her interrogatories, FCA identified Ms. Campau as one of three individuals who "participated in the decisionmaking process."  (Pl.'s Resp. Ex. 16 at 4, ECF No. 29-17 at Pg ID 899.) FCA replies that "participat[ing] in the process" does not mean Ms. Campau made or participated in the termination decision itself.  (Def.'s Reply at 7 n.3, ECF No. 32 at Pg ID 921.)  Ms. Campau testified that her participation was limited to issuing the termination *after* the In Re decided to end Ms. Gaines' employment. (Campau Dep. at 29, ECF No. 29-9 at Pg ID 786.)

plaintiff's supervisor, who was shown to have discriminatory animus, issued a disciplinary warning to the plaintiff. *Id*. at 414. The plaintiff's ultimate termination, although not issued by the supervisor, was based on that disciplinary warning. *Id*. at 414-15. A reasonable jury could find that Mr. McNeill reported Ms. Gaines' use of the Maintenance Department's shared drive to store an HFA file intending for it to lead to her termination.

FCA maintains that there is no evidence Ms. Gaines was terminated because she engaged in protected activity, as the investigation regarding her misuse of company assets began before she complained about race and gender discrimination. FCA's investigative summary reflects that Mr. McNeill and Mr. Johnson reported the presence of Ms. Gaines' non-profit file on the shared drive on or about September 28, 2017, which FCA argues was well before Ms. Gaines' January 12, 2018 "reply all" email. Ms. Gaines filed a race and gender discrimination complaint in May 2017, however. Mr. McNeill brought Ms. Gaines' HFA file on the shared drive to Ms. Campau's attention at approximately the same time FCA's investigation concerning Ms. Gaines' May 2017 complaints against him were concluding. (*See* Campau Dep. at 27, ECF No. 29-9 at Pg ID 785; Def.'s Mot. Ex. N, ECF No. 25-15 at Pg ID 323.) Moreover, the decision to terminate Ms. Gaines was made after her January 2018 complaint.

Even if Ms. Gaines establishes a prima facie case of retaliation, FCA contends that it had a legitimate non-retaliatory reason for terminating her employment—that being, the use of FCA assets for non-FCA business. According to FCA, Ms. Gaines acknowledged during her deposition that FCA policy prohibits employees from using their laptops and email for personal business and she was warned in 2016 that she could not use company assets to promote a non-profit organization, even if FCA also supported the organization. (Def.'s Reply Br. at 5, ECF No. 32 at Pg ID 919, citing Gaines Dep. at 107-08, 124, ECF No. 25-2 at Pg Id 151, 155; *see also* Def.'s Mot. Ex. C, ECF No. 25-4 at Pg Id 238.)

Ms. Gaines can show that FCA's asserted reason for terminating her employment was a pretext for retaliation by showing it "(1) has no basis in fact, (2) did not actually motivate [FCA's] conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Ms. Gaines does not dispute that she used her FCA laptop and email in conjunction with her personal non-profit business. She maintains, however, that her conduct was not in violation of FCA's policies, did not actually motivate FCA's decision, and was insufficient to warrant her termination.

FCA argues that Ms. Gaines cannot create a question of fact regarding its stated reason for her termination by asserting her subjective belief that her conduct did not violate corporate policy. (Def.'s Reply Br. at 6, ECF No. 32 at Pg ID 920.)

32

The Sixth Circuit has stated that "disputes about the interpretation of company policy do not typically create genuine issues of fact regarding whether a company's stated reason for an adverse employment action is a pretext designed to mask unlawful discrimination." (*Id.*, quoting *Sybrandt v. Home Depot*, 560 F.3d 553, 558-60 (6th Cir. 2009).) The *Sybrandt* court relied on the "honest belief rule," which provides that " 'as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.' " 560 U.S. at 559 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).

Nevertheless, a court must "not blindly accept an employer's alleged business judgment in the face of a claim of discrimination." *Philbrick v. Holder*, 583 F. App'x 478, 487 (6th Cir. 2014) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)). To rely on the honest belief rule, the employer must show "that it made a 'reasonably informed and considered decision.' " *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). "[A] jury may consider the reasonableness, or lack thereof, of an employer's business judgment, insofar as it may assist in determining the employer's state of mind." *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) (citations omitted).

Liability is not presumed if the employer demonstrated poor business judgment, " 'although [it] may be probative of whether the employer's reasons are pretexts for discrimination.' " *In re Lewis*, 845 F.2d at 633-34 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). There is sufficient evidence from which a jury could find pretext in this case.

A reasonable juror could conclude that FCA's decision was not reasonably informed and considered. Ms. Gaines maintains that she used her FCA laptop to work on her nonprofit, HFA, in the evening and on weekends and during breaks at work. (Gaines Dep. at 93, 113, ECF No. 29-3 at Pg ID 533, 538.) FCA did not attempt to determine the amount of time Ms. Gaines spent on HFA business during her workday, despite the ability to do so (*see* Gaydos Dep. at 90-91, ECF No. 29-5 at Pg ID 644) and despite the fact that one of the policies it cited for her termination expressly states that FCA assets "may occasionally be used for non-business purposes" under certain circumstances. (*See* Def.'s Mot. Ex. W, ECF No. 25-24 at Pg ID 437.) It is unclear how Ms. Gaines' involvement in HFA could be

seen as posing a conflict of interest or how she violated the charitable activities policy. (*See id.*; Def.'s Mot. Ex. P at 2, ECF No. 25-17 at Pg ID 375.)

It is not evident from Ms. Campau's note to Ms. Gaines' file (*see* Def.'s Mot. Ex. C, ECF No. 25-4 at Pg ID 238) that the counseling Ms. Gaines received in 2016 informed her that what she subsequently did in 2017 was prohibited. As Ms. Gaines testified, when she was counselled in 2016, it was "solely about raising money for [an organization fighting breast cancer]." (Gaines Dep. at 124, ECF No. 29-3 at Pg ID 541.) Ms. Gaines understood from that counselling that she was "not supposed to do fundraising and solicit funds." (*Id.*) There is no indication that Ms. Gaines used FCA assets to solicit funds for her non-profit (HFA).

Contrary to FCA's assertion, Ms. Gaines did not acknowledge during her deposition that FCA policy prohibited her from using her laptop and email for personal business.[8] Rather, Ms. Gaines testified that she was aware she could be disciplined for using her laptop "for unauthorized or inappropriate uses[.]" (*Id*. at 106, Pg ID 537.) Ms. Gaines believed that she had received authorization to work on HFA business. (*Id.* at 99-100, 116, 118-20, 232.) When it was brought to Ms. Gaines' attention that her activities were problematic during her meeting with Mr. Gaydos and Mr. Liczbinski, she stopped using her FCA laptop for her non-profit

---

[8] As set forth in Ms. Gaines' termination letter, FCA policies do not in fact completely prohibit the use of company assets for non-business purposes. (*See* Def.'s Mot. Ex. W, ECF No. 25-24 at Pg ID 437.)

work.  (*See* Gaines Dep. at 93, 231, ECF No. 29-3 at Pg 533, 568.)  Mr. Gaydos'

analysis confirmed that Ms. Gained did not create any HFA files on FCA devices

after December 2017.  (Gaydos Dep. at 83, ECF No. 29-5 at Pg ID 642.)

While Mr. McNeill claims that Mr. Johnson discovered Ms. Gaines' HFA

file because the Maintenance Department's shared drive was full, this was never

reported to Mr. Gaydos and he had no reason to believe it was full.  (Gaydos Dep.

at 51-52, ECF No. 25-23 at Pg ID 408.)  In her email to Ms. DeLoach reporting

Mr. McNeill's finding of a "file" on the shared drive, Ms. Campau also did not

mention that the drive was full; nor did the investigative report include this claimed

explanation for how Mr. Johnson discovered the file.  (*See* Campau Dep. at 68,

ECF No. 29-9 at Pg ID 795; Def.'s Mot. Ex. P, ECF No. 25017.)  Further,

according to Ms. Gaines, Mr. Gaydos told her that his office's involvement in her

case was unusual, as they typically were asked to investigate employees suspected

of using their FCA laptops to access pornography, gamble, or engage in illegal

activity, not something "good."  (Gaines Dep. at 92-93, 108-110, ECF No. 29-3 at

Pg ID 533, 537.)  Mr. Gaydos and Mr. Liczbinski testified that they have been

asked to investigate employees for using FCA resources to run for-profit

businesses, to access pornography, internet gambling, and excessive shopping,

internet surfing, and streaming of videos and movies.  (Gaydos Dep. at 41, 100-01,

ECF No. 29-5 at Pg ID 632, 647; Liczbinski Dep. at 16-17, ECF No. 29-6 at Pg ID

666-67.)  And according to Ms. Gaines, Mr. Gaydos said there was nothing unauthorized or improper with respect to what she had done.[9]  (Gaines Dep. at 93, 108-110, 118-19, 231, ECF No. 29-3 at Pg ID 533, 537-38, 540, 568.)

Finally, there is no evidence in the record that termination was mandatory following violation of these policies.  Ms. Gaines presents evidence to show that other FCA employees were not terminated for misuse of FCA assets.  (Gaydos Dep. at 100-01, ECF No. 29-5 at Pg ID 646-47.)  FCA maintains that it treated Ms. Gaines the same for the misuse of her computer before she complained of discrimination and afterward.  (Def.'s Reply Br. at 6, ECF No. 32 at Pg ID 920.)  However, before she engaged in protected activity, FCA did not terminate Ms. Gaines for misusing her laptop; rather, she was simply given a verbal warning.  (Def.'s Mot. Ex. C, ECF No. 25-4 at Pg ID 238.)  After she complained of discrimination, FCA terminated her.  (*Id*. Ex. W, ECF No. 25-24.)

In its reply brief, FCA also argues that Ms. Gaines lacks proof of discriminatory intent, as required under § 1981 and the ELCRA.  (Def.'s Reply Br. at 8, ECF No. 32 at Pg ID 922.)  Reply briefs generally are not the proper place to raise arguments for the first time.  *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513

---

[9] FCA seems to question the relevancy of what Mr. Gaydos may have said to Ms. Gaines.  (*See* Def.'s Reply at 7, n.3, ECF No. 32 at Pg ID 921.)  While neither Mr. Gaydos nor Mr. Liczbinski made the termination decision, their opinions as the persons charged with investigating alleged FCA violations involving company assets may be probative of pretext.

F.3d 546, 553 (6th Cir. 2008) (citing cases) ("we have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses"); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 676 (6th Cir. 2006) (Griffin, J., concurring) (a district court properly declines to consider an issue raised for the first time in a reply brief). In any event, while Ms. Gaines may have testified that she did not know "what [Mr. McNeill's] intentions were" (Gaines Dep. at 57-58, ECF No. 29-3 at Pg ID 525), there is sufficient evidence from which a reasonable juror could find an intent to discriminate and retaliate in this case.

## V.     Conclusion

For the reasons stated, the Court concludes that Ms. Gaines' ELCRA hostile work environment claim based on gender fails as a matter of law. FCA is entitled to summary judgment with respect to this claim. There are genuine issues of material fact precluding summary judgment in FCA's favor on Ms. Gaines' remaining claims.

Accordingly,

**IT IS ORDERED** that FCA's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 30, 2020

38